Ian S. Dooley
Jeremy Lieb
Erik Grafe
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: idooley@earthjustice.org
E: jlieb@earthjustice.org
E: egrafe@earthjustice.org

*Attorneys for Plaintiffs Sierra Club et al.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SIERRA CLUB; FRIENDS OF THE EARTH; and GREENPEACE, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior; and STEVE COHN, in his official capacity as Alaska State Director of the Bureau of Land Management, <br><br> *Defendants*. | Case No. 3:22-cv-00189-JMK |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (5 U.S.C. §§ 701-706; 42 U.S.C. § 4332)

## INTRODUCTION

1.     This action arises from the Bureau of Land Management's (BLM) approval of Emerald House's Peregrine oil and gas exploration program in the National Petroleum Reserve-Alaska (Reserve).[1]  The environmental assessments (EA) prepared by BLM for the program do not meet the requirements of the National Environmental Policy Act (NEPA).  Plaintiffs seek a declaratory judgment finding that BLM's approval of the exploration program was unlawful, vacatur of the initial Decision Record approving the program, vacatur of the subsequent Decision Record approving an amendment to the right-of-way for the program and an additional application for a permit to drill (APD), and enjoinment of further exploration activities until BLM has complied with NEPA.

2.     This is a case about BLM's decision to approve an oil and gas exploration program in furtherance of future oil development, a major source of climate pollution, without adequate discussion or analysis of the exploration program's impacts on climate change.

3.     We are rapidly approaching a "point of no return" where the worst effects of climate change will wreak havoc across the Earth.  *See Juliana v. United States*, 947 F.3d 1159, 1166 (9th Cir. 2020).

4.     Temperatures across the globe are rising at an unprecedented rate.

---

[1] Emerald House is a wholly owned subsidiary of Australian-owned 88 Energy. Accumulative Energy Alaska, Inc., is also a wholly owned subsidiary of 88 Energy. These 88 Energy subsidiaries are referenced in the applications, environmental analyses, and decision documents for the exploration program.

5.     Nowhere are these impacts more observable than in Alaska's Arctic region. The Arctic is experiencing temperature increases four times that of the global rate.  This is resulting in, among many other impacts, rapid degradation of the sea-ice and snow cover extents, the greening of tundra and unprecedented increases in the soil active layer, and a predicted three-fold increase in the incidence of wildfire in Alaska by the end of the century.  These impacts are being experienced most acutely by the people and wildlife that depend on Alaska's Arctic.

6.     The unprecedented increase in temperatures is caused by the production and combustion of fossil fuels.  The most significant risks and impacts from climate change would be avoided if we limit the global increase in temperature to 1.5 degrees Celsius (°C) above pre-industrial levels.  To limit temperature rise to 1.5°C above pre-industrial levels, industrialized nations like the United States must rapidly transition away from producing and consuming fossil fuels.

7.     The Peregrine exploration program itself requires the annual combustion of hundreds of thousands of gallons of fossil fuels to power construction, exploration, camp, and cleanup activities, resulting in greenhouse gas emissions in the Reserve.

8.     The program's ultimate objective is to explore, delineate, and appraise the oil and gas prospect for potential future development, production, and consumption.  The result of that consumption would be climate pollution.

9.     Despite the program's direct and indirect climate consequences, BLM approved the program without assessing the greenhouse gas emissions that would result

from oil and gas produced and consumed if exploration results in discovery, development, and production.  BLM later assessed only a fraction of the direct emissions that would result from on-the-ground operations to conduct the exploration.

10.    BLM's failure to analyze these reasonably foreseeable greenhouse gas emissions consequences from approving the Peregrine exploration program violates NEPA.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Judicial review is available under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.  Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

12.    Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization.  The Sierra Club is a national nonprofit organization of approximately 800,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Alaska Chapter of the Sierra Club has approximately 1,600 members.  The Sierra Club's concerns encompass a variety of environmental issues in

Alaska and beyond, and the organization has long been active on issues related to oil and gas activities in America's Arctic, including in the Reserve, such as polar bear conservation. Sierra Club members use the public lands in the Arctic, including the Reserve, for quiet recreation, aesthetic pursuits, and spiritual renewal.

13. Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation with a headquarters in Washington, DC, an office in Berkeley, California, and staff located across the U.S., including in Alaska. Friends of the Earth is a membership organization consisting of nearly 294,000 members, including more than 650 members who live in Alaska, and more than 4.9 million activists nationwide. Friends of the Earth is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals. Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including in the Reserve, have on the climate and people, fish, birds, and other species that depend on this region. Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic.

14. Plaintiff Greenpeace, Inc. (Greenpeace) is a non-profit corporation organized under the laws of the State of California, with its principal place of business in

Washington, D.C.  Its mission is to promote the protection and preservation of the environment.  Greenpeace is an independent campaigning organization that uses peaceful, creative action to expose global environmental problems and to force solutions that are essential for a green and peaceful future.  Greenpeace has over 780,000 active supporters in the United States.  For more than a decade, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to press for serious cuts in greenhouse gas emissions through local, national, and global action.  In the United States, Greenpeace has run a campaign aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems.  As a part of these efforts, Greenpeace has actively worked to protect the Arctic from the harmful effects of oil and gas activities.

15.     Plaintiff organizations have members and supporters who visit, or otherwise use and enjoy the Reserve.  For example, one member has used and plans to continue to use areas affected by the Peregrine program for rafting and hiking.  Another member relies on the areas affected by the Peregrine program for hunting and for cultural and traditional purposes.  Members use these areas for recreation, wildlife viewing, photography, subsistence, professional livelihood, education, aesthetic, and traditional and cultural purposes.  Plaintiffs and their members derive scientific, recreational, aesthetic, conservation, spiritual, cultural, nourishment, and other benefits and enjoyment from their use of the area and from wildlife that depend on the Reserve, including areas affected by the Peregrine program.  The activities authorized by defendants will injure

these interests.

16.     The plaintiff organizations monitor the use of Reserve ecosystems and compliance with the laws respecting these ecosystems, educate their members and the public concerning management of the ecosystems, and advocate policies and practices that conserve the natural values of the ecosystems.  Plaintiffs cannot achieve these organizational purposes fully without adequate information and public participation in the processes required by law.  Plaintiffs' interests and organizational purposes are directly and irreparably injured by defendants' violations of the laws as described in this complaint.

17.     Plaintiffs participate actively in the administrative processes regarding management of the Reserve and did so for the Peregrine program.  Plaintiffs Sierra Club and Friends of the Earth submitted comments on December 29, 2020, detailing the many ways in which BLM's approval of the Peregrine program was unlawful.  Plaintiffs submitted letters to BLM and the United States Department of the Interior on September 17, 2021, November 30, 2021, and February 4, 2022, explaining how the agency had failed to consider the climate impacts of its actions and again urging reconsideration of the Peregrine program.  Plaintiffs have exhausted administrative remedies for the decisions challenged in this complaint.

## DEFENDANTS

18.     Defendant BLM is the agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve and that issued the EAs and decisions challenged in this action.

19.     Defendant United States Department of the Interior is an agency of the United States responsible for oversight of BLM.

20.     Defendant Deb Haaland is sued in her official capacity as Secretary of the United States Department of the Interior (Secretary).  The Secretary is the highest position within the Department of the Interior, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and has specific responsibilities related to the administration of the Reserve.

21.     Defendant Steve Cohn is sued in his official capacity as Alaska State Director of BLM.

## STATEMENT OF FACTS

**I.     The climate crisis.**

22.     The rate of climate change is rapidly increasing.

23.     Overwhelming evidence shows that the unprecedented increase in Earth's temperatures is caused by fossil fuel combustion.

24.     If left unchecked, climate change will "wreak havoc on Earth's climate." *Juliana*, 947 F.3d at 1166.

25. Without "some action, the destabilizing climate will bury cities, spawn life-threatening natural disasters, and jeopardize critical food and water supplies." *Id.* We are "approaching 'the point of no return.'" *Id.*

26. Several scientific studies show there is a "tipping point" or threshold at which the most dangerous effects of climate change could occur abruptly and irreversibly.

27. There is international consensus that limiting the global increase in temperature to 1.5°C above pre-industrial levels would significantly reduce the risks and impacts from climate change.

28. Each ton of carbon dioxide released into the atmosphere contributes to global warming.

29. As recent scientific information demonstrates, any additional increase in greenhouse gas emissions from fossil fuel consumption increases the likelihood of failing to limit warming to 1.5°C.

30. The federal government plays an important role in addressing the climate crisis and in ensuring the U.S. does not exhaust its share of the global carbon budget.

31. In 2018, it was estimated that carbon emissions released from extraction and end-use combustion of fossil fuels produced on federal lands alone accounted for approximately one quarter of total U.S. carbon emissions during the period between 2005 and 2014.

32. Analysis shows that the potential carbon emissions from already leased

fossil fuel resources on federal lands could exhaust the remaining U.S. carbon budget consistent with the 1.5°C target.

33.    Indeed, to meet the 1.5°C target, the U.S. must not only phase out production in some existing fields and mines before their reserves are fully depleted but also limit new development on undeveloped fossil fuel leases.

34.    While avoiding reaching the 1.5°C target could halt the most catastrophic consequences of climate change, severe impacts from the climate crisis are occurring right now.

35.    The harms caused by climate change "are serious and well recognized," and "have already inflicted significant harms" to many resources around the globe. *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).

36.    There is high confidence among scientists that climate change has already caused substantial damage and irreversible loss among terrestrial, freshwater, and oceanic ecosystems.

37.    There is agreement that climate change has caused widespread deterioration of ecosystem structure and function.

38.    The increase in magnitude of extreme heat has caused mass mortality events on land and in the ocean.

39.    Hundreds of local losses of species are attributable to increases in magnitude in extreme heat.

40.    Climate change is causing shifts in seasonal timing and forcing thousands

of species to shift polewards or to higher elevations.  This strategy is unlikely to be successful for some populations, leading to extirpation or extinction.

41.    Climate change is also having a profound effect on human health and wellbeing.

42.    Climate change is among the top threats to global health in the 21st century.

43.    Increased temperatures from climate change have been linked to an increase in adverse mental and physical health outcomes.

44.    Increases in disasters caused by climate change have also been demonstrated to cause higher incidences of interpersonal and domestic violence, including intimate partner violence, particularly towards women.

45.    Extreme weather events and higher temperatures associated with climate change contribute to increased rates of anxiety, depression, drug and alcohol abuse, and suicide.

46.    Indigenous communities are particularly vulnerable to harmful climate change related impacts on mental and physical health.

## II.    The Reserve.

47.    The 23-million-acre Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, wetlands, upland areas, and sensitive coastal resources.  It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, among many other species.

48.     The Reserve landscape and wildlife are central to the livelihood and traditional practices of Iñupiaq people living in the region.  The Reserve also provides habitat for three of Alaska's four Arctic caribou herds, which provide vital subsistence resources for more than 40 communities in northern and western Alaska.

49.     Within the Reserve, the Colville River watershed provides historical overwintering and migration areas for members of the 56,000 caribou of the Teshekpuk Caribou Herd.

50.     The Colville River is the largest river in Arctic Alaska, supporting populations of pink and chum salmon, burbot, broad whitefish, arctic cisco, and other fish species, and providing habitat for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

51.     The Secretary designated the 2.44-million-acre area along the Colville River and two of its larger tributaries, the Kogosukruk and Kikiakrorak rivers, as a Special Area within the Reserve.  The Colville River Special Area was designated to assure maximum protection of its subsistence, fish and wildlife, recreational, and other identified values, such as the unique bluff and riparian habitats associated with the Colville River and its tributaries.

## III.    Climate change in the Reserve.

52.     The effects of climate change are especially observable in Alaska's Arctic.

53.     During the latter half of the 20th century, the Arctic region experienced

temperature increases two to three times the global rate of increase.

54.     Now, during the first two decades of the 21st century, the Arctic region is experiencing temperature increases four times that of the global rate of increase.

55.     The Arctic's average winter temperature has increased by 6 degrees Fahrenheit (°F) over the past 60 years, and the Arctic is expected to warm by an additional 10°F to 12°F this century.

56.     This rapid warming presents myriad disruptions to Arctic ecosystems, including in the Reserve.

57.     In the Arctic, climate change is causing, and will continue to cause, sea-level rise, sea-ice melt, river flow changes, and permafrost thaw.

58.     There is nowhere in the country or the world where global warming is causing greater increases in mean air temperatures.  The effects of climate change are directly observable in the Arctic.

59.     The extent of spring snow cover has been decreasing over the Arctic region since 2005.  This, combined with shorter snow cover duration, is causing a reinforcing feedback effect, leaving more land surface uncovered, which in turn absorbs more of the sun's energy and causes further depletion of existing snow cover.

60.     The sea-ice extent has dramatically decreased in the Arctic.  The region experienced the lowest coverage of winter sea-ice on record in 2017, and measurements show the sea-ice extent to be approximately half of what it was in 1979.

61.     Like the loss in snow cover, the loss in the sea-ice extent also creates a

feedback effect on climate, causing an increased amount of the sun's energy to be absorbed by the ocean, which in turn increases the rate of sea-ice melt.

62.     It is expected that summertime sea ice will be completely lost by 2050 or earlier.

63.     The increases in air temperatures are also having pronounced effects on the permafrost and the plants and specialized ecosystems in the Arctic.

64.     The Arctic's permafrost layer is expected to decrease significantly by the end of the century, releasing carbon dioxide and methane into the atmosphere and accelerating climate feedback effects.

65.     Alaska's Arctic is experiencing substantial increases in tundra greenness, contributing to increasingly limited opportunities for tundra travel by local communities.

66.     Permafrost on Alaska's Arctic coast has warmed substantially, causing profound changes in the soil active layer temperatures.

67.     As a result of climate change, the annual area burned by wildfire in Alaska is expected to double by 2050 and to triple by the end of the century.

68.     The expected increase in wildfire will in turn release commensurate amounts of carbon dioxide into the atmosphere, illustrating yet one more climate feedback system.

**IV.     BLM's management of oil and gas activities in the Reserve.**

69.     In 1976, Congress passed, and subsequently amended in 1980, the Naval

Petroleum Reserves Production Act (Reserves Act), which transferred jurisdiction over the Reserve from the Navy to the Secretary, in recognition of the area's significant ecological value and the need to protect it. Pub. L. 94-258, Title I §§ 102-03, 90 Stat. 303-04 (codified at 42 U.S.C. §§ 6502-6503). The Reserves Act created a management structure for the Reserve. 42 U.S.C. § 6502.

70. Because of the world-class wildlife and subsistence values of the Reserve, the Reserves Act requires the Secretary to protect and conserve these other resources and uses in the Reserve any time the Secretary authorizes oil and gas leasing, exploration, and development. *Id.* §§ 6504(a), 6506a(b).

71. The Reserves Act requires the Secretary to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve. *Id.* § 6506a(b).

72. Surface values of the Reserve may be protected by limiting, restricting, or prohibiting the use of and access to lands within the Reserve, including within Special Areas. 43 C.F.R. § 2361.1(e)(1). This includes the authority to require a suspension of operations and production if BLM determines that it is in the interest of conservation or "mitigates reasonably foreseeable and significantly adverse effects on surface resources." 43 C.F.R. §§ 3135.2(a)(1), (3).

73. The Reserves Act further requires the Secretary to provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or

historical or scenic value." 42 U.S.C. § 6504(a). "Special [A]reas" are "areas within the [R]eserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve." 43 C.F.R. § 2361.0-5(f).

74.     BLM manages oil and gas activities in the Reserve pursuant to a multi-stage process.

75.     BLM first promulgates activity plans. The Reserve activity plans are programmatic management plans that zone areas of the Reserve as open or closed to oil and gas activities.

76.     In the second stage, BLM determines whether, when, and where to hold lease sales in any portions of areas that the activity plans have designated as open for leasing.

77.     In the third stage, BLM reviews exploration plans submitted by lessees.

78.     BLM retains the authority to approve, modify, or deny approval of exploration plans submitted by lessees. 42 U.S.C. §§ 6506a(b), (k); 43 C.F.R. §§ 3135.2(a)(1), (3); *id.* § 3162.3-1(h).

79.     In the fourth stage, BLM reviews plans for developing and producing fossil fuels.

80.     In 2013, BLM issued its first-ever comprehensive management plan, called an integrated activity plan, covering the entire Reserve (2013 IAP). Consistent with its

programmatic nature, the environmental impact statement (EIS) BLM prepared for the 2013 IAP generally described the potential impacts from all stages of oil and gas exploration and development across the 11.8 million acres open to leasing under the plan.

81.     The 2013 IAP explicitly deferred the more specific and detailed analysis necessary to assess impacts of on-the-ground actions such as exploration programs until such actions were proposed, stating "[f]uture actions requiring BLM approval, including a proposed exploratory drilling plan . . . would require further NEPA analysis based on specific and detailed information about where and what kind of activity is proposed." BLM, National Petroleum Reserve-Alaska, Final Integrated Activity Plan/Environmental Impact Statement, Vol. I at 9 (Nov. 2012).

82.     In 2020, BLM published a final EIS for the revised 2020 integrated activity plan (2020 IAP).  As with the 2013 IAP, the EIS for the 2020 IAP again generally described the potential impacts from all stages of oil and gas exploration and development and explicitly deferred site-specific analysis necessary for on-the-ground actions until such actions are proposed:  "Future on-the-ground actions requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the site-specific proposal."  BLM, National Petroleum Reserve-Alaska, Final Integrated Activity Plan and Environmental Impact Statement, Vol. I at 1-6 (June 2020).

83.     In April 2022, after determining the 2020 IAP Record of Decision (ROD) was inconsistent with the administration's climate policies, BLM published a new ROD

for the IAP for the Reserve. In the 2022 ROD, BLM selected the no-action alternative, reverting Reserve management to the 2013 IAP while continuing to rely on the EIS for the 2020 IAP.

**V.      Greenhouse gas emitting activity in the Reserve.**

84.      Recent years have seen a significant increase in industrial activity in the Reserve.

85.      In 2015, BLM approved ConocoPhillips Alaska, Inc.'s (ConocoPhillips) Greater Mooses Tooth 1 (GMT-1) development, which extended oil and gas infrastructure west from the existing Alpine development.

86.      In 2018, BLM approved ConocoPhillips' Greater Mooses Tooth 2 (GMT-2) development, extending the road and pipeline network further west into the Reserve.

87.      In 2020, BLM approved ConocoPhillips' Willow Master Development Plan (Willow), which authorized the furthest westward development in the Reserve to date. Although BLM's approval of Willow was vacated by the U.S. District Court for the District of Alaska in August 2021, BLM, on July 8, 2022, released a draft supplemental EIS, again moving the permitting process forward for Willow.

88.      Oil and gas development projects and plans in the Reserve are in addition to the other seismic, snow and ice road construction, and drilling projects that have occurred, are occurring, or are expected to occur in the Reserve each year.

89.      There are thousands of helicopter takeoffs, landings, and flights occurring

in the Reserve each year, in support of oil and gas activities.

90.    There are other winter travel and support activities that occur in the Reserve each year, in furtherance of past, ongoing, and planned oil and gas activities.

91.    Oil and gas activities in the Reserve and surrounding areas have resulted in greenhouse gas emissions.

92.    Oil and gas activities in the Reserve and surrounding areas are releasing greenhouse gas emissions.

93.    Oil and gas activities in the Reserve and surrounding areas are foreseeable to result in future greenhouse gas emissions.

**VI.    The Peregrine program.**

94.    Peregrine is a five-year exploration program.

95.    The objective of the program is to explore, delineate, and appraise oil and gas for potential future development.

96.    The exploration program involves nearly year-round activity.

97.    In the winter, snow road construction and drilling equipment is hauled overland via the Community Winter Access Trail, across the Colville River at Ocean Point, and then south to where the Peregrine Snow Road is to be built annually.

98.    Winter activities include the use of fossil fuels to power the annual construction, use, and deconstruction of more than 80 miles of snow road and drill sites.

99.    Fossil fuels power the annual mobilization and demobilization of personnel,

personnel camps, and construction and drilling equipment.

100. Emissions sources from the program include the use of and traffic from pickups, heavy equipment, a fuel truck, a crew bus, an 80-ton crane, a drilling rig, and the daily use of other combustion-powered vehicles, generators, and heaters.

101. Winter program activities also require almost daily aircraft traffic.

102. Summer activities include hundreds of helicopter flights, takeoffs, and landings.

103. Program activities include the annual use of hundreds of thousands of gallons of fuel and the flaring of any produced gas.

104. Program activities are occurring in the southeast region of the Reserve, within the Colville River watershed, crossing the mainstem of the river and two of its larger tributaries, the Kikiakrorak and Kogosukruk rivers.

105. Activities are occurring within or very near the Colville River Special Area.

106. This part of the Reserve is free from oil and gas development, situated between multiple Alaska Native communities that rely on caribou, moose, wolves, wolverine, and other resources in the Reserve. The Peregrine program area is also home to the Teshekpuk Caribou Herd, providing critical overwintering habitat and spring and fall migration grounds.

107. Exploration activities are occurring within 15 miles of Umiat, near a prior Umiat test well site.

108. Umiat is a historic oil field that BLM has previously estimated to hold one

billion barrels of oil.

109.    BLM considers Umiat to be an area where new oil and gas development is likely to occur.

110.    BLM acknowledged in the 2022 supplemental draft EIS for Willow that activities associated with future development of the Peregrine prospect, such as ice-road and gravel pad construction, are reasonably foreseeable.

## VII.    BLM's NEPA analyses and approval of the Peregrine program.

111.    BLM approved the five-year exploration program without quantifying or analyzing any greenhouse gas emissions resulting from its approval.  After Emerald House applied for an amendment to the right-of-way permit for the program and an additional APD, BLM conducted further NEPA analysis, in furtherance of implementation of the five-year program.  In this second analysis, BLM again failed to quantify or analyze any indirect or cumulative greenhouse gas emissions from the program and instead only assessed direct operational emissions from a single winter of exploration activity.

### A.    BLM's approval of 2020 summer activities in reliance on a categorical exclusion.

112.    On August 14, 2020, BLM approved summer exploration-related helicopter activities to evaluate the Peregrine Snow Road and to inspect seven potential drill sites for exploration wells, in preparation for its drilling program.

113.    BLM relied on a categorical exclusion from further NEPA analysis to

approve the activities.

114. The categorical exclusion included the exact location and a map of each of the seven proposed well site locations that Emerald House intended to explore.

115. The categorical exclusion also discussed how two of the well sites would be staked for drilling in winter 2020/2021.

**B.** **BLM's 2020/21 EA and approval of the drilling program, first two APDs, and right-of-way.**

116. On November 30, 2020, BLM notified the public of Emerald House's proposed Peregrine program.

117. On December 29, 2020, conservation groups, including plaintiffs Sierra Club and Friends of the Earth, submitted detailed comments on BLM's draft EA.

118. BLM issued the final 2020/21 EA for the program and based on that document, issued a finding of no new significant impact (FONNSI).

119. On January 14, 2021, BLM approved Emerald House's plan to conduct the five-year exploration drilling program.

120. In approving the program, BLM cited the 2020 Council on Environmental Quality (CEQ) regulations. BLM could have applied the 1978 NEPA regulations in effect prior to the CEQ's September 2020 revision, because BLM's approval was for ongoing activities that had been approved on August 14, 2020, through the categorical exclusion. These activities were approved before the September 14, 2020, effective date of the 2020 CEQ rule.

121.    BLM authorized two APDs and the five-year right-of-way implementing that plan (FF097644).

122.    The approved APDs were for drill sites named Merlin-1 and Harrier-1.

123.    In the 2020/21 EA, BLM did not quantify or analyze the exploration program's direct operational or downstream greenhouse gas emissions or the program's impacts on climate change.

124.    The 2020/21 EA does not discuss or analyze how greenhouse gas emissions from Peregrine's activities will cumulate with emissions from past, ongoing, and expected oil and gas activities in the Reserve, or with emissions from past, ongoing, and expected oil and gas activities on nearby state and privately held lands.

125.    In the 2020/21 EA, and in response to public comments on the draft EA, BLM relied on "tiering" to the 2020 IAP/EIS and ROD, asserting that the document adequately assessed the greenhouse gas impacts of the Peregrine program.

126.    The 2020 IAP/EIS does not discuss the impacts from the five-year Peregrine exploration program.

127.    The 2020 IAP/EIS assumes exploration project activities would be short term, continuing for less than one year.

128.    The 2020 IAP/EIS's climate analysis does not assess the significance of greenhouse gas emissions that will result from activities resulting from the IAP.

129.    The 2020 IAP/EIS's climate analysis does not assess the significance of how impacts from IAP emissions would differ over time due to changes in emissions

levels and national and global efforts to curb climate change.

130.    The 2020 IAP/EIS does not analyze how greenhouse gas emissions from development resulting from the IAP will contribute to the success or failure to limit warming to 1.5°C.

131.    The 2020 IAP/EIS does not explain why BLM could not assess the significance of greenhouse gas emissions from the IAP in the context of the climate crisis.

132.    The 2020 IAP/EIS's analysis of emissions is inadequate and does not account for new circumstances and information, such as updated production estimates for Willow, or the 1.6-billion-barrel estimate for the Peregrine prospect.

**C.      Emerald House's 2020/2021 exploration activities and new information.**

133.    Emerald House only drilled one well, Merlin-1, during the 2020/2021 winter.

134.    After its first year of drilling and analyzing results, Emerald House's parent company, 88 Energy, announced to shareholders that Peregrine potentially holds 1.6 billion barrels of petroleum.

135.    88 Energy determined the geological chance of success based on the first year of drilling to be 56 percent.

136.    Geological chance of success indicates the chance of finding hydrocarbons in a reservoir capable of sustained flow.

137.     Plaintiffs submitted an additional letter to BLM on September 17, 2021, reiterating the defects in BLM's analysis and approval of the Peregrine exploration program, and explaining how the program threatened the climate and was unnecessary and imprudent, given the challenges of the climate crisis and national and international commitments to reduce emissions.

138.     In the letter, plaintiffs also highlighted the new information about the potential for Peregrine to yield 1.6 billion barrels of petroleum.

139.     In a separate letter to BLM on November 30, 2021, plaintiffs again urged BLM to consider the climate impacts of its approval of the Peregrine exploration program.

140.     In the November letter, plaintiffs explained that Emerald House's parent company determined the geological chance of success at Merlin-2 to be 56 percent.

141.     In that same letter, plaintiffs pointed out how BLM had failed to quantify and analyze any direct, indirect, or foreseeable greenhouse gas emissions from its approved activities.

142.     Plaintiffs provided BLM with substantial climate science describing the current state of the climate crisis.

143.     Plaintiffs also pointed BLM to studies, models, and reports that show BLM could quantify greenhouse gas emissions from Peregrine and analyze their impacts on climate change.

144.     BLM did not supplement its analysis in the 2020/21 EA to account for the

climate information provided by plaintiffs.

145. BLM did not supplement its analysis in the 2020/21 EA to account for the specific data from Emerald House's drilling of Merlin-1.

**D.    BLM's 2021/22 EA and approval of a right-of-way amendment and a new APD.**

146. On November 24, 2021, BLM posted notice of Emerald House's application to amend the Peregrine right-of-way and for an additional APD to drill the Merlin-2 well site.

147. Emerald House's application was made to continue to explore, delineate, and appraise the oil and gas potential of the Peregrine prospect.

148. On December 20, 2021, BLM completed the 2021/22 EA.

149. In the 2021/22 EA, BLM again cited the 2020 CEQ regulations. BLM could have applied the 1978 NEPA regulations because BLM's approval was for ongoing activities. The 2021/22 EA was also prepared after the Secretary had issued Secretarial Order No. 3399, directing all Interior bureaus and offices not to apply the 2020 NEPA rule to change the application or level of NEPA that would apply to a proposed action.

150. As with its first, 2020/21, EA, BLM confined its analysis of the Peregrine exploration program and its impacts to just one year of the five-year program.

151. BLM quantified the greenhouse gas emissions that would be produced directly from construction of one well.

152. BLM calculated the social cost of greenhouse gases from the megatons of

Case 3:22-cv-00189-JMK   Document 1   Filed 08/25/22   Page 26 of 36

emissions from that one well.

153. BLM characterized its estimate as the "Social Cost of Greenhouse Gases Associated with Future Development" of Peregrine. *See* 2021/22 EA at 47, Tbl. 2.10.

154. BLM's social cost of greenhouse gas estimate was only for the cost of constructing and drilling one well that winter, not accounting for emissions from potential future development.

155. BLM acknowledged that one year's worth of Peregrine exploration activities required 643,320 gallons of fuel for operations.

156. BLM did not quantify operational greenhouse gas emissions for the first, third, fourth, or fifth years of the five-year program.

157. BLM did not quantify downstream greenhouse gas emissions from foreseeable development of Peregrine.

158. BLM did not analyze how Peregrine's greenhouse gas emissions would cumulate with emissions from past, ongoing, and foreseeable future oil and gas activities in the Reserve, or with emissions from past, ongoing, and foreseeable future oil and gas activities on nearby state and privately held lands.

159. BLM only listed winter activities that would occur during the 2021/2022 winter. BLM did not consider how the operational or downstream emissions of these projects would cumulate with greenhouse gas emissions from Peregrine.

160. BLM has not calculated the total greenhouse gas emissions that have resulted and are expected to result from its approval of the five-year exploration program.

161.     In the 2021/22 EA, BLM did not acknowledge or analyze the estimate based on the first winter's drilling that Peregrine could hold 1.6 billion barrels of petroleum or that Emerald House's parent company estimated its geological chance of success to be 56 percent.

162.     BLM did not consider that Emerald House applied for the APD to drill Merlin-2 to further delineate the 1.6-billion-barrel estimate that resulted from Emerald House's drilling of Merlin-1 the previous winter.

163.     BLM again relied on tiering to the 2020 IAP/EIS to substantiate its analysis in the 2021/22 EA.

164.     On the same day that BLM issued the 2021/22 EA, it issued a FONNSI and Decision Record approving the amendment to the right-of-way and additional APD.

165.     At that point, BLM had not offered an opportunity for the public to comment on the 2021/22 EA.

166.     Plaintiffs submitted a letter to BLM on January 7, 2022, urging the agency to suspend approval of the activity until the public could have an opportunity to comment on the EA.

167.     BLM opened a 14-day public comment period.

168.     Plaintiffs submitted another comment letter to BLM on February 4, 2022, once again urging the agency to fully analyze the impacts to the climate from the exploration program and reiterating the substantial available information BLM had to complete such an analysis.

169. After receiving public comments, BLM did not revise the 2021/22 EA.

170. BLM issued a Public Comment Response that acknowledged that each phase of the agency's oil and gas decision making process requires site-specific analysis of greenhouse gas emissions.

171. BLM's Public Comment Response did not quantify total greenhouse gas emissions for the five-year program.

172. BLM's Public Comment Response did not quantify downstream greenhouse gas emissions that could result from development of Peregrine.

173. The Public Comment Response did not acknowledge or analyze that Peregrine was estimated to contain 1.6 billion barrels of petroleum or that Emerald House's parent company calculated a 56 percent chance of geological success.

174. On February 7, 2022, BLM issued addendums to its FONNSI and Decision Record for the five-year exploration program, once again approving the amendment to the right-of-way and the Merlin-2 APD.

**E.  Peregrine program activities are ongoing.**

175. During the 2020/21 winter, Emerald House drilled at the Merlin-1 drill site, and stated, through its parent company 88 Energy, it planned to drill at Harrier-1 the following winter.

176. Instead of drilling Harrier-1 during the 2021/22 winter, Emerald House drilled the delineation well at Merlin-2.

177.    Summer helicopter cleanup activities were scheduled to occur in July of this year.

178.    Beyond this summer's activities, there are three winters and summers left in Emerald House's five-year exploration program.

179.    The Harrier-1 APD was granted as part of the prior, 2020/2021 BLM decision.

180.    The Harrier-1 wellsite has yet to be drilled.

181.    Emerald House's parent company, 88 Energy, has stated its intent to continue studying the results from its drilling at Merlin-2.

182.    88 Energy reported to shareholders that it has multiple drill-ready targets that remain untested in the Peregrine prospect, including the already approved Harrier-1 drill site.

183.    Winter construction and drilling activities are planned to occur from November to May.

184.    As a necessary component of the winter activities, summer helicopter activities are expected to occur again during the summer of 2023.

**VIII.  Peregrine's potential impacts on climate change.**

185.    Peregrine's past program activities have contributed to global warming and climate change.

186.    In the 2021/2022 EA, BLM acknowledged that winter program activities

*Sierra Club et al. v. BLM et al.,*
Case No. 3:22-cv-00189-JMK

29

require 643,320 gallons of fuel annually. BLM also estimated that one year alone of Peregrine construction and drilling operations will cause 438.3 metric tons of carbon dioxide equivalent to be released. And BLM acknowledged one year of construction and drilling will result in a potential social cost of between $6,000 and $68,000. BLM did not acknowledge, quantify, or analyze emissions from construction and drilling for the other four years of the exploration program.

187. There are three years left in the five-year exploration program, the operations of which would contribute to global warming and climate change.

188. The exploration program would also cause foreseeable downstream greenhouse gas emissions, which would contribute to global warming and climate change.

189. Emerald House's parent company estimated 1.6 billion barrels of petroleum to lie beneath Peregrine. Expert analysis provided to BLM showed the combustion of that amount of petroleum could result in 645 million metric tons of carbon dioxide being released. If the social cost of those emissions was estimated to be released today—using the same discount value ranges BLM used in the 2021/22 EA for the cost of constructing one well—the result would be a cost ranging between approximately $34,326,255,000 and $102,315,705,000.

190. BLM did not acknowledge, quantify, or analyze potential downstream greenhouse gas emissions from the Peregrine exploration program.

# CLAIMS FOR RELIEF

I.    **First claim for relief (failure to adequately analyze the climate consequences of the exploration).**

191.    Plaintiffs incorporate by reference all preceding paragraphs.

192.    NEPA requires federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

193.    NEPA requires agencies to adequately analyze the environmental consequences of a proposed action, including disclosing and analyzing direct, indirect, and cumulative impacts from the proposed action or alternatives.  40 C.F.R. §§ 1508.1(g), 1502.14, 1502.16.

194.    An agency is also required to utilize "reliable existing data and resources" in its analysis.  *Id.* § 1502.23.

195.    When an agency considers a decision that will result in greenhouse gas emissions, NEPA requires the agency to analyze and disclose the effects of these emissions, including the emissions from construction and operation of a project as well as emissions from fossil fuels that will be burned because they will be produced or delivered to market as a reasonably foreseeable result of the agency's decision.

196.    If an agency decides not to prepare an EIS for a major federal action, it must supply a convincing statement of reasons to justify its conclusion that a project will have no new significant impacts on the environment.  *Id.* § 1508.1(l).

197.     BLM approved a five-year drilling program, right-of-way, and three APDs.

198.     In the 2020/21 EA, BLM did not quantify or analyze any greenhouse gas emissions consequences of these decisions.

199.     In the 2021/22 EA, BLM analyzed only the direct emissions from operations proposed for the 2021/22 drilling season.

200.     BLM has not quantified or analyzed direct, operational emissions for the other years of the drilling program.

201.     BLM has not quantified or analyzed the downstream greenhouse gas emissions that could result from its approval of the five-year exploration program.

202.     BLM's failure to disclose and analyze the direct, indirect, and cumulative greenhouse gas emissions from its actions was arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1508.1(g), 1502.14, 1502.16, and the APA, 5 U.S.C. § 706(2).

203.     BLM's decision to issue a FONNSI without providing a convincing statement of reasons to justify its conclusion that the program's impacts to climate change will be insignificant was arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. § 1508.1(l), and the APA, 5 U.S.C. § 706(2).

## II.     Second claim for relief (failure to supplement the analysis in light of new information).

204.     Plaintiffs incorporate by reference all preceding paragraphs.

205.    NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

206.    Agencies are required to supplement a NEPA analysis "if a major federal action remains to occur, and . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii).

207.    Issuance of a federal permit to approve a project with adverse impact on the environment is a major federal action.

208.    BLM was provided with new information and data relevant to its decision concerning downstream greenhouse gas emissions that could result from its approval of the five-year program.

209.    BLM did not supplement the 2020/21 EA to consider new data and information relevant to its decision concerning downstream greenhouse gas emissions that could result from its approval of the five-year program.

210.    BLM's failure to supplement the 2020/21 EA was arbitrary, capricious, and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. § 1502.9(d)(1)(ii), and the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.     Enter a declaratory judgment that defendants' decisions to approve the Peregrine exploration program and issue FONNSIs were arbitrary, capricious, and/or not in accordance with law;

B.     Vacate defendants' Decision Records approving the Peregrine exploration program;

C.     Enjoin further exploration activities until BLM has complied with NEPA;

D.     Award plaintiffs the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.     Grant such other relief as this Court deems just and proper.

Respectfully submitted this 25th day of August, 2022.

<div style="margin-left: 30%;">

*s/ Ian Dooley*
_____
Ian S. Dooley (Alaska Bar No. 2006059)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: idooley@earthjustice.org

*s/ Jeremy Lieb*
_____
Jeremy Lieb (Alaska Bar No. 1810088)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org

</div>

*Sierra Club et al. v. BLM et al.,*
Case No. 3:22-cv-00189-JMK

34

s/ Erik Grafe
_____
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: egrafe@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Friends of the Earth, and Greenpeace, Inc.*